FINLAY v. SMITH.

THE EVELETH.

No. A–17383.

District Court, E. D. New York.

June 4, 1946.

See, also, 64 F.Supp. 186.

Purdy & Lamb, of New York City (Edmund Lamb, of New York City, of counsel), for libellant.

Mahar & Mason, of New York City (Frank C. Mason, of New York City, of counsel), for respondent-claimant.

GALSTON, District Judge.

The tug Eveleth, on April 29, 1943, with the libellant's wooden oil tank barge and a small scow in tow, left Arverne, Long Island, bound for Barnegat City, New Jersey. Within a few hours thereafter the oil barge sank. The loss is charged to the tug for having undertaken the tow in the prevailing weather conditions of wind and sea.

The answer denies fault on the part of the tug and ascribes the sinking solely to the unseaworthy condition of the barge.

The libellant was the owner of some dredging equipment which had been lying at the foot of 72nd Street, Arverne, Long Island, in Jamaica Bay. The equipment consisted of a dredge, scows and miscellaneous apparatus which the libellant had been using in the Idlewild Airport development. In April, 1943, the libellant and the Raymond Marine Company entered into an agreement for the towage of the equipment by the company to Barnegat City, New Jersey. In due course the respondent-claimant's tug Eveleth towed the dredge and some other equipment to Barnegat. Then, because of unfavorable weather conditions which persisted for a period of two weeks, completion of the towage contract was postponed.

However, on the night of April 28, 1943 it was decided to tow the barge and the small scow on the following morning. Prior to leaving Arverne, Mathison, libellant's dredge captain, battened down the two hatches of the barge, one on the port bow forward, and the other on the starboard side aft. Through the hatch cover near the pump he drilled a hole in the center of the hatch, to permit a hose to be run. Canvas was put over the hatches and battens affixed on top of the canvas. Mathison also lashed everything on the deck, including some empty oil barrels and a large fuel oil tank, 8 feet by 8 feet by 24 feet, was fastened to the deck with two pieces of angle iron about 6 by 6, welded or bolted to the top of the tank, with an inch rod going through. The tank rested on two 12 by 12 timbers, lying crosswise on the barge. There were about 3500 gallons of oil in the tank. Loaded in that fashion, the barge had practically 20 inches of free board at the stern and 30 inches at the forward end. The horse power of the Eveleth was 230.

On April 28th there was a strong northwesterly wind, of between fourteen and twenty miles an hour, continuing, though of lesser velocity, on the 29th. But it was an off shore wind, and caused no rolling sea from the harbor toward Rockaway. The oil barge was towed stern first on a bridle hawser, with about 50 feet of line out at the start of the tow. At about 5:30 A.M. the tow proceeded from the inlet under the Long Island Railroad tressel, and

then passed under the Crossway Boulevard Bridge. From the Crossway Boulevard Bridge the tow headed toward the Marine Parkway Bridge at full speed. On passing the last bridge, the hawsers from the tug to the oil barge were lengthened to 200 feet. At about 7:30 A.M. the oil barge sank when abreast of the stone jetty off Rockaway Point. At that time the tide was ebb. The captain of the tug had looked back every five minutes and to him everything appeared in order. The captain denied that the sea was choppy.

From the captain's recital, which I accept, it would seem that neither wind nor sea nor any fault in towing could be ascribed as the cause of the sinking.

But critical is the question of seaworthiness. On that issue the libellant's testimony is very weak indeed. Mathison testified that he had inspected the barge between January and April. He was asked:

"Q. Now had you personally inspected this boat at any time between January and April of 1943? A. Oh yes. I used to come out there quite often.

"Q. And when you say 'quite often' do you mean that you just looked at them or did you have any duties with respect to them? A. Well, sometimes, if a thing is leaking or something, I go down and examine it and see what the cause is—not only that barge but on all of the barges."

So far as he knew, no repairs or renewals had been made on the boat during the time from November 1942 to the day of the towage.

Finlay, a brother of the libellant who was associated in the enterprise with him, admitted that he had been informed by Abrams, a carpenter, that there was "a little leak in that corner and it was repaired. Mr. Abrams looked at it and he repaired some of it."

The testimony of Willkie, a marine surveyor who went aboard on April 8, 1943, in connection with insurance of the barge and other equipment, added no weight to the evidence concerning seaworthiness. He knew nothing about the inside of the hull, contending that an interior condition of rottenness of some timber or king posts or rake timber would not affect the seaworthiness of the boat for towage. Franich, a watchman employed by the libellant, said that he pumped the boat during the two weeks preceding April 29th; that he took off the canvas and strips but did not re-nail the strips to the deck or on the hatchway. Franich also testified that two weeks before the boat was towed, sawdust had been dumped in the water around the boat to stop leaks. During the tow, according to Franich, the cover was off the hatch. He had taken it off on the morning that they left. He was asked:

"Q. Did you put the hatch cover back on after you left the dock? A. No.

"Q. Then as I understand it, while you were in tow this hatch was open so that you could see out. A. That's right."

To keep the hatch cover off was in disregard of Willkie's direction to have the hatches covered.

The barge was not proved to be seaworthy, and moreover not without significance as explaining one cause of the rapid sinking in the brief period of three or four minutes, is the fact that the hatch cover was off despite Willkie's admonition that the boat was leaking. It must be concluded that the sinking was caused not because of unfavorable weather or sea, but because of her unseaworthiness and the carelessness of the bargeman.

The libel will be dismissed. Concurrently with the filing of this opinion, appropriate findings of fact and conclusions of law will also be filed.